SAMUEL E. FAIRFIELD, EXECUTOR, *vs.* EDWIN N. LAW-SON AND OTHERS.

A testator gave certain property to a trustee, for the use of his widow during her life, and after her death "the income to be devoted to the education of the freedmen, and paid over annually to the proper officers of the Freedmen's Association for that purpose by the trustee." The term "freedmen" was one generally applied to the lately emancipated slaves and their descendants. There were numerous organizations which had for their object the education of these people, but no one which bore the name of Freedmen's Association. Held—

1. That evidence that the testator told the scrivener who drew the will that he wanted to give the income of the property in trust for the education of the freedmen, and that there was a freedmen's association organized by the Methodist church people in Cincinnati, and that he wanted it payable to the officers of that association, was inadmissible.

2. That the trustee could not appropriate the income for the education of the freedmen as a class.

The power given the trustee was merely to pay the income to the proper officers of the Freedmen's Association. The court could not prescribe an additional duty without making an addition to the will.

Besides, the freedmen were several millions in number, and no power was given to the trustee, or to any one, to select the individuals who should receive the benefit. Every individual would therefore have a right to share in the bounty, and it would be impossible to administer the trust.

If a charity does not fix itself on a particular object, but is general and indefinite, and no plan is prescribed and no discretion given in the will for the selection of the beneficiaries, it does not admit of judicial administration.

Fairfield *v.* Lawson.

Under the rule which admits parol evidence in cases of ambiguity, to aid in the construction of a will, it is necessary that the words of the will should describe accurately the subject or object of the gift, and that the parol evidence should go only to show which of certain properly described subjects or objects was intended.

Another item in the same will was as follows: "I give to my executor all my real estate, to be sold, and the proceeds held in trust for the education of the freedmen, and the income to be paid by him to the proper officers of the Freedmen's Association, or disposed of as he pleases." Held—

1. That the trust adhered to the proceeds in the hands of the executor, even though the trust failed as to the Freedmen's Association.
2. That it became then a gift upon trust, with no provision as to who should take the benefit of it, and therefore could not be carried out.
3. That the fund became intestate estate, and that the executor took nothing personally.

SUIT asking for the construction of a will; brought to the Superior Court in Tolland county. The following facts were found by the court:—

David Lawson, the testator, died February 10th, 1881, leaving real estate of the value of $12,000 and personal estate of the value of $9,688. He left a will, made in 1868, which was proved after his death, and which contained the following clauses:

"I give unto William M. Corbin three thousand three hundred and fifty dollars, in trust for my wife, Polly Lawson. Said trustee shall pay her the interest of said sum of money in manner following   *   *   so long as she shall live. And from and after the death of my said wife, the interest shall be used and employed and devoted to the education of the freedmen, and the interest shall be paid over annually to the proper officers of the Freedmen's Association for that purpose by the said trustee.

"I devise unto my executor hereinafter named, all of my real estate in whatever place situated, the same to be sold by him after my decease, and the proceeds to be held by him in trust for the education of the freedmen, and the annual interest and income arising from the same to be paid by him to the proper officers of the Freedmen's Association, or to be disposed of and used as he pleases.

"I give unto my executor hereinafter named all the rest

and residue of my estate, to be disposed of by him in manner following: that is to say, the sum of five hundred dollars to be expended in erecting a suitable monument over my grave; and after the payment of expenses of settling my estate, the remainder shall be held in trust by my said executor for the education of the freedmen, and the interest shall be paid over annually to the proper officers or persons of the Freedmen's Association by my said executor.

"I do hereby constitute and appoint Samuel E. Fairfield, Esq., executor of this my last will and testament."

At the date of the execution of the will and at the time of the death of the testator there had not been established any voluntary association nor any corporation known as the "Freedmen's Association." There were, however, in existence at the first mentioned date divers associations, organized for and engaged in the work of educating the freedmen. "The Hartford Freedmen's Aid Society," a voluntary association, was organized for that purpose in June, 1865, and continued in the work until June, 1869, when it ceased to exist. "The New England Freedmen's Aid Society," another voluntary association, located at Boston, Mass., was also then in existence and continued in that work until 1871, when it ceased to exist. There was also "The Freedmen's Bureau," organized under the laws of the United States, March 3, 1865. This organization ceased to exist long before the death of the testator. There was also in existence at the date of the execution of the will, "The American Missionary Association," a body corporate by the laws of the state of New York, incorporated in 1849, for the purpose of sending the gospel to the destitute in our our own and other countries, but at said date they were actively engaged and ever since have been and still are in the work of educating the freedmen as well as preaching the gospel to them.

At the date of executing the will there was also a volun tary association of individuals connected with the Methodist Episcopal Church engaged in the work of educating the freedmen, known by the name of "The Freedmen's Aid

Society of the Methodist Episcopal Church, located at Cincinnati, Ohio." This was organized August 8th, 1866, and continued to exist as a voluntary association until November 17, 1870, when it ceased to exist as a voluntary association, and upon application of its members a corporation was organized under the laws of the state of Ohio under the same name and located at the same place. The object of the voluntary association, as stated in its articles of agreement, was—" to labor for the relief and education of the freedmen, especially in co-operation with the Missionary and Church Extension societies of the Methodist Episcopal Church." In its constitution or articles of incorporation the object is stated in the same words except that after the word "freedmen" are added the words "and others." The articles for the government of the voluntary association were not identical with, but in some respects radically different from those of the corporation. The former was under the control of a board of managers, consisting of the bishops of the Methodist Episcopal Church, two persons, one minister, and one layman, named by any annual conference organizing an auxiliary society, together with certain persons, thirty-six in all, named, and such others as might be thereafter elected at any quarterly or annual meeting of the society, while the corporation was to be governed by a board of directors (nineteen persons being mentioned), and their successors, who were to be elected annually. Since the organization of the corporation it has been and still is actively engaged in the work of educating the freedmen.

Neither the latter organization nor any other voluntary association or corporation has appeared and claimed the legacies mentioned in the will, payable to the proper officers of the " Freedmen's Association," although the officers of the "Freemen's Aid Society of the Methodist Episcopal Church" have had notice of the terms of the will and of the pending litigation.

There was no evidence whatever before the court to show that the last mentioned organization was intended by the

testator, except his verbal declarations as hereinafter mentioned.

The plaintiff offered Samuel E. Fairfield as a witness, who testified that he drew the will in question at the dictation of the testator, who said he wanted to give the income of the property in question in trust for the education of the freedmen, that there was a Freedmen's Association organized by the Methodist Church people, located in Cincinnati, Ohio, and that he wanted it payable to the officers of that association.

This evidence was received subject to the defendants' objection. If legally admissible for the purpose, the court finds that wherever in the will the testator refers to the "Freedmen's Association" he intended the voluntary association known by the name of "The Freedmen's Aid Society of the Methodist Episcopal Church," located at Cincinnati and organized August 8th, 1866.

If, on the other hand, the verbal declarations of the scrivener are not admissible or competent to prove the fact above stated, then I find that there is no evidence whatever to identify the object of the testator's bounty, described as the Freedmen's Association, and it is impossible for the court to determine it.

The court further finds that the term "freedmen," as used in the will, refers to that class of persons in the United States who were emancipated from slavery during our late civil war or by its results, and embraces also the descendants of such persons.

Upon these facts the following questions were reserved for the advice of this court:—

1. Whether the declarations of the testator were admissible for the purpose stated ? And if so,

2. Whether the corporation entitled "The Freedmen's Aid Society of the Methodist Episcopal Church," located at Cincinnati, Ohio, can take the legacies specifically intended by the testator for the voluntary association of the same name existing when the will was executed ?

3. Whether, if for any reason that corporation cannot

take, the trustees named in the will (or others to be appointed by the court for the purpose) can rightfully use and appropriate the income for the education of the freedmen, as constituting a definite class of persons?

4. Whether the devise of the proceeds of the sale of the real estate in the secònd item of the will is so expressed as to vest the real estate or the proceeds thereof absolutely in Samuel E. Fairfield in fee, or whether the devise is for any reason void in whole or in part?

5. Whether any clauses or provisions in said will, and if so, which ones, are void for uncertainty, inconsistency, or for any other cause?

*M. R. West* and *E. B. Sumner*, with whom was *S. E. Fairfield*, for the plaintiff.

1. The instructions of the testator to the scrivener, at the time the will was drawn, were admissible. 1 Redf. on Wills, 272, 496, 577; 1 Jarman on Wills, 748; *Cheyney's Case*, 5 Coke, 68; *Beaumont* v. *Fell*, 2 P. Wms., 141; *Thomas* v. *Thomas*, 6 T. R., 671: *Brewster* v. *McCall's Devisees*, 15 Conn., 274; *Ayers* v. *Weed*, 16 id., 291; *Am. Bible Society* v. *Wetmore*, 17 id., 181; *Dunham* v. *Averill*, 45 id., 61, 68; *Tucker* v. *Seamen's Aid Society*, 7 Met., 188; *Trustees* v. *Peaslee*, 15 N. Hamp., 317; *Wagner's Appeal*, 43 Penn. St., 102; *Woods* v. *Moore*, 4 Sandf., 579.

2. The Freedmen's Aid Society of Cincinnati can take the legacies given to the "Freedmen's Association." Powell on Devises, 421; *Brewster* v. *McCall's Devisees*, 15 Conn., 274, 292; *Ayers* v. *Weed*, 16 id., 291, 299; *Am. Bible Society* v. *Wetmore*, 17 id., 181, 186; *White* v. *Howard*, 38 id., 342.

3. If that society can not take the legacies, then the trustees can rightfully appropriate the income of the property for the education of the freedmen as a definite class of persons. 2 Swift Dig., 111; 2 Redf. on Wills, 818; Perry on Trusts, 407; *Bull* v. *Bull*, 8 Conn., 47; *Am. Bible Society* v. *Wetmore*, 17 id., 181, 188; *Treat's Appeal from Probate*, 30 id., 113; *White* v. *Howard*, 38 id., 342; *Adye* v. *Smith*, 44 id., 60; *Burbank* v. *Whitney*, 24 Pick., 146; *Bartlett* v.

*Nye,* 4 Met., 378; *Wells* v. *Doane,* 3 Gray, 203; *Bliss* v. *Am. Bible Society,* 2 Allen, 334; *McAllister* v. *McAllister's Heirs,* 46 Verm., 272: *Chambers* v. *City of St. Louis,* 29 Misso., 543; *Hopkins* v. *Upshur,* 20 Tex., 89.

4. The devise of the proceeds of the sale of the real estate vests the real estate or the proceeds of its sale absolutely in Fairfield, the executor. 1 Swift Dig., 141; 3 Washb. R. Prop., 695; 4 Kent Com., 319; 1 Redf. on Wills, 175; 2 id., 707, 732; *Ingersoll* v. *Knowlton,* 15 Conn., 468; *Hull* v. *Culver,* 34 id., 403; *McKenzie's Appeal from Probate,* 41 id., 607; *Guthrie* v. *Wheeler,* 42 id., 285, 292; *Lewis* v. *Palmer,* 46 id., 454; *Maltby's Appeal from Probate,* 47 id., 349; *Jackson* v. *Coleman,* 2 Johns., 391; *McDonald* v. *Walgrove,* 1 Sandf. Ch., 274; *Ide* v. *Ide,* 5 Mass., 500; *Reed* v. *Reed,* 9 id., 372; *Wells* v. *Doane,* 3 Gray, 201; *Bacon* v. *Woodward,* 12 id., 376; *Musselman's Estate,* 39 Penn. St., 469; *Ralston* v. *Telfair,* 2 Dev. Eq., 255; *Ramsdell* v. *Ramsdell,* 21 Maine, 288, 293; *Gibbs* v. *Rumsey,* 2 Ves. & B., 294.

*A. P. Hyde* and *D. Marcy,* for the defendants.

1. Evidence of the declarations of the testator as to his intention in the gift to the "Freedman's Association" is clearly inadmissible. The case does not fall within any rule under which such declarations are admitted. *Dunham* v. *Averill,* 45 Conn., 61; *Ackworth* v. *Benton,* 18 Weekly Reporter, 988; *S. C.,* 22 Law Times, N. S., 776; Wigram on Wills, part 1, §§ 180 to 184; id., part 2, § 15.

2. The trustees have no power under the will to apply the income of the property to the education of the freedmen as a class. Their sole duty and power in the matter is to pay over the income to the proper officers of the Freedmen's Association. Besides, such an administration of the charity among the millions of the freedmen would be impossible. *White* v. *Fisk,* 22 Conn., 31; *Treat's Appeal from Probate,* 30 id., 113; *Cram* v. *Bliss,* 47 id. 592; *Grimes's Exrs.* v. *Harmon,* 35 Ind., 198; *Am. Tract Society* v. *Atwater,* 30 Ohio St., 77.

3. Fairfield takes no personal interest under the clauses

in question.. If the bequests fail, the property becomes intestate estate. 1 Jarman on Wills, 680; 2 Story Eq. Jur., § 979 *b ; Morice* v. *Bishop of Durham*, 10 Ves. Jr., 527; *Gibbs* v. *Rumsey*, 2 Ves. & B., 296; *Fowler* v. *Garlike*, 1 Russ. & M., 232; *Wheeler* v. *Smith*, 9 How., 79; *Saylor* v. *Plaine*, 31 Maryl., 158; *Nichols* v. *Allen*, 130 Mass., 211; *Adye* v. *Smith*, 44 Conn., 60.

LOOMIS, J. Those parts of the will of David Lawson that are so obscure as to require the advice of this court relate to the bequests to the Freedmen's Association and to Fairfield to be used as he pleases.

1. Who can take the legacy payable to the proper officers of the "Freedmen's Association"? We cannot advance a single step toward the solution of this question unless resort may be had to parol evidence, because the record shows that there was no such organization or corporation in existence as the Freedmen's Association at the date of the execution of the will; and this expresses but a small part of the difficulty, for the further finding is that except a single item of parol evidence, the admissibility of which is one of the questions reserved, there was absolutely no evidence of any kind to identify the object of the testator's bounty.

The evidence in question consisted merely of the oral instructions given by the testator to the scrivener, Fairfield, "that he wanted to give the income of the property in question in trust for the education of the freedmen; that there was a Freedmen's Association organized by the Methodist Church people located in Cincinnati, Ohio, and that he wanted it payable to the officers of that association."

Now it is very common to admit parol evidence in cases for the construction of wills. The difficulty here is not owing merely to the fact that the evidence is oral, but to its relation to the written words of the will. The law is imperative that the entire will must be in writing, and herein are found the rules and limitations that must be applied to such evidence. The intent must in every case

be drawn from the will, but never the will from the intent. The test therefore to be applied in all cases where evidence like that under consideration is tendered, is, whether there appears on the face of the will sufficient indication of intention to justify the application of the evidence. The words of the will are so controlling that if they apply with exactitude to one person, such person will take the legacy, although parol and extrinsic evidence might make it perfectly clear that another person less exactly described was the one intended.

This principle was applied by this court in the recent case of *Dunham et al.* v. *Averill et al.*, 45 Conn., 61, where the legacy was to " The American and Foreign Bible Society," and it appeared that that society was one mainly supported by the Baptist denomination; but that there was another society supported by the Congregational and Presbyterian denominations, named the " American Bible Society," sometimes called " The American and Foreign Bible Society," and that the testator's sympathies and preferences were all with the latter; and evidence was offered that while the will was being drawn the testator said to the scrivener that he wished to give the money to the Bible Society sustained by the Congregationalists and Presbyterians; that he was not sure as to its corporate name, but believed it to be " The American and Foreign Bible Society"; but the evidence was held not admissible. So it has been uniformly held that parol evidence cannot be received to correct a mistake in the will. *Avery* v. *Chappel*, 6 Conn., 270; *Comstock* v. *Hadlyme Ecc. Society*, 8 id., 254; *Tucker* v. *Seamen's Aid Society*, 7 Met., 188; *Jackson* v. *Sill*, 11 Johns., 201.

The principle we are contending for is also applied in another class of cases, where parol and extrinsic evidence is admitted. I refer to the rule derived from the maxim, " *Falsa demonstratio non nocet, cum de corpore constat,*" where the office of the parol evidence is to reject that part of the description which is false, but in such case it is indispensable that enough remains in *the words of the will* to show plainly the intent, but in no case can any words be added to the description.

Another prominent rule is, that when the question is one of construction the parol or extrinsic evidence must be ancillary to a right understanding of the language of the will; hence all direct evidence of intention as contra-distinguished from evidence to show the meaning of the written words in the will is inadmissible. This rule is well illustrated by the case of *Goblet* v. *Beechey*, given at length in the second American edition of Wigram on Extrinsic Evidence, p. 287, Appendix, and also briefly reported in 3 Simons, 24. Nollekins, the sculptor, by a codicil to his will desired that " all the marble in the yard, tools in the shop, bankers, mod, tools for carving, &c., should be the property of the plaintiff. A lady who was an attesting witness was offered to prove that before she subscribed her name she read the codicil in the hearing of the testator, and when she came to the word "mod " she asked him what he meant by it, and he replied " models." Sir JOHN LEACH, Vice Chancellor, held the testimony inadmissible, but allowed an inquiry as to the meaning of the term itself from the testimony of sculptors. See also cases referred to in 2 Phillips's Evidence, (Cowen & Hill's notes) p. 754.

So far the rules referred to, if applied to the evidence in question, rigidly exclude it. Is there then any exception or additional rule under which it may be received? The case shows that it was sought for the purpose of ascertaining the beneficiary, to prove the specific intention of the testator by his oral declarations to the scrivener who drew the will. There is only one rule that can be invoked as applicable to such a case. This is stated very clearly by Lord ABINGER, Chief Baron, in *Hiscocks* v. *Hiscocks*, 5 Mees. & Wels., 363, whose opinion, Redfield says, in his Treatise on Wills, vol. 2, p. 566, is universally admitted to have settled the law that such evidence is only admissible in the one instance there stated, namely, " where the meaning of the testator's words is neither ambiguous nor obscure, and where the devise is, on the face of it, perfect and intelligible, but, from some of the circumstances admitted in proof, an ambiguity arises as to which of the two or more things, or which of the two or

more persons, *each answering the words in the will*, the testator intended to express. Thus, if a testator devise his manor of *S.* to *A. B.* and has two manors of *North S.* and *South S.*, it being clear he means to devise one only, whereas both are equally denoted by the words he has used, in that case there is what Lord BACON calls 'an equivocation,' that is, the words equally apply to either manor, and evidence of previous intention may be received to solve this latent ambiguity; for the intention shows what he meant to do; and when you know that, you immediately perceive that he has done it by the general words he has used, which, in their ordinary sense, may properly bear that construction. It appears to us that, in all other cases, parol evidence of what was the testator's intention ought to be excluded, upon this plain ground, that his will ought to be made in writing, and if his intention cannot be made to appear by the writing, explained by circumstances, there is no will."

Now it seems to us that under this rule the proposed evidence cannot apply, because the words of the will describing the beneficiary do not apply equally to two or more, "each answering to the words of the will." On the contrary the words used are not applicable to any known organization, either voluntary or incorporated. Such in substance is the finding. When therefore we learn from the parol evidence what the actual intent was, we do not "immediately perceive that the testator has effectuated his intent by the general words he has used;" on the contrary, the effect of the evidence in this case is rather to increase the mystery that hangs over the words in the will. The name "Freedmen's Association" in itself considered would naturally import an association composed of freedmen, as the names "Lawyers' Association," "Doctors' Association," "Farmers' Association," would indicate the membership of each.

It is very strange, if the testator gave such instructions to the scrivener as the evidence indicates, that no one of the prominent features of his description should find its way into the will as written. The prominent things in his description were, the religious body that organized the asso-

ciation and its location at Cincinnati, Ohio, but of these things the words of the will are silent, and it does not appear how or why the words "Freedmen's Association" alone were used; there was no discussion concerning the name; no suggestion that the name used would be sufficient, nor that the Cincinnati society had ever been so called. As the case stands upon the record the instructions given by the testator were not carried into effect by the scrivener, and the court has no power to correct the mistake, as it would upon like evidence correct a mistake in a contract. We should be virtually making a will as to the beneficiary from the actual intent proved only by parol.

We have not deemed it necessary to review the numerous cases bearing upon this question. While there is now substantial harmony among the courts concerning the abstract principles that apply, there is, it must be confessed, considerable diversity in their application. We have therefore preferred to test the somewhat extraordinary features of this case by a pretty strict application of the principles of evidence and construction, and our conclusion is that the parol evidence cannot be received for the purpose of showing that the legacy in question is payable to the officers of "The Freedmen's Aid Society of the Methodist Episcopal Church located in Cincinnati, Ohio;" and it is pleasant to know that this society will not be disappointed by this result, for it appears that, although they well knew the terms of the will and the fact of the pending litigation, yet they have never claimed the legacy in question.

2. The next question is, whether the trustees named in the will, (or others to be appointed by the court for the purpose,) can rightfully use and appropriate the income for the education of the freedmen as constituting a definite class of persons?

It is contended that, as the purpose and object of the bequests under consideration are the education of the freedmen, who constitute a definite class of persons, the charity will not be suffered to fail for the want of a competent agent to administer it. If this were the only difficulty in

the case it might easily be overcome, for there is no doubt that the court can supply the want of a trustee. There is in fact no such want here. Corbin and Fairfield are named as trustees. But in each of the clauses where bequests are made for the education of freedmen the trustees have no discretion given them in the will. On the contrary, all discretion is taken away by the express direction to pay the income over to the proper officers of the Freedmen's Association. When they have performed this duty there is nothing left for them to do under the will, and the court cannot prescribe an additional duty without in effect making an addition to the will. But it is argued that the freedmen are the *cestuis que trust*, and that if the trustees only pay the money for their education it effectuates the intention of the testator as indicated in the will; that the certainty required is only to point out the class, no matter how indefinite may be the particular recipients of the benefit within that class. It is found that the term "freedmen," as used in the will, refers to that class of persons who were emancipated during the late civil war and their descendants. As matter of common knowledge we may be permitted to say that the numbers composing this class are now about six millions. Of all these, only a very few individuals could by any possibility receive any of the benefits contemplated by the will. It is not within the range of probability that different individuals or corporations, separately charged with the duty of disbursing the testator's bounty, would so perform it as to benefit the same individuals of the class. A change therefore in disbursing agents, or a change in the mode of selecting beneficiaries, not provided for in the will, constitutes in effect a change of the bequest. Hence, in addition to a definite class it is indispensable that the will itself should prescribe some mode of selection, or give to some person a discretionary power to select; in short, a will must be executed in the way and manner which the testator provides, and if, owing to the indefiniteness of the object or the mode provided, this cannot be done, then the subject of the trust is not disposed of, but results to the benefit of those to

whom the law gives the property in the absence of a valid will.

The cogent reasoning of Buskirk, J., in giving the opinion in *Grimes's Exrs.* v. *Harmon et al.,* 35 Ind., 198, furnishes most ample support for the positions we have taken in this discussion. In that case the bequest was " to the Orthodox Protestant Clergymen of Delphi, and their successors, to be expended in the education of colored children, both male and female, in such way and manner as they may deem best, of which a majority of them shall determine; my object being to promote the moral and religious improvement and well-being of the colored race." The court, after a most exhaustive and able review of all the authorities, held that the legacy was void for vagueness and uncertainty; placing the decision upon the following propositions, among others,—that the testator intended that his beneficiaries should be selected from the children of the colored race residing within the United States; that the persons composing the class were very numerous and as each one had a beneficial interest in the fund it would be utterly impossible to execute the trust; that under the will as construed by the court the trustees had no power or discretion to select the beneficiaries from the class designated; that there is no difference in principle whether a devise be immediate to an indefinite object, or to a trustee for the use and benefit of an indefinite object; that if it be immediate, to an indefinite object, it is void, and if it be a trust for an indefinite object, the property that is the subject of the trust is not disposed of, and the trust results to the benefit of those to whom the law gives the property in the absence of any other disposition of it; and that if a charity does not fix itself on a particular object, but is general and indefinite and no plan or scheme is prescribed and no discretion is given in the will to select the beneficiaries, it does not admit of judicial administration.

3. The remaining question relates to the construction of item second of the will, which reads as follows: " I do give, devise and bequeath unto my executor hereinafter

named, all of my real estate in whatever place situated, the same to be sold by him after my decease, and the proceeds to be held by him in trust for the education of the freedmen, and the annual interest and income arising from the same to be paid by him to the proper officers of the Freedmen's Association, or to be disposed of and used as he pleases."

The construction of this clause of the will, we think, must depend on the question whether the idea of a trust adheres to the proceeds in the hands of the executor to the last, whether he pays it over to the officers of the Freedmen's Association or exercises his own pleasure and discretion as to whom it may be paid to, or whether the trust drops out altogether at the commencement of the alternative clause, so that the bequest was either a trust or no trust at the will of Fairfield.

We think the first is the better construction. In the first place we think, if the testator had intended a personal gift to Fairfield, as he was a lawyer, and was employed to draft the will, and was made executor to administer it, that if he had so understood it the terms of the will would have been more explicit, for it would have occurred to both that such a gift, covering as it did the principal part of the estate, would necessarily excite the suspicions of the disinherited heirs, who would desire to defeat it. And in the next place, we think the language used indicates that the testator intended to stamp all this property with a permanent trust. The bequest is not to Fairfield by name, but to his executor, and the testator expressly says that the proceeds of the sale of all the real estate are to be held in trust by the executor, and then follows a statement of the purposes.

Upon this construction is the trust one that can be enforced? Lord LANGDALE, in *Knight* v. *Knight*, 3 Beavan, 148, 174, defining the certainty required to create a valid trust, says:—" Any words by which it is expressed, or from which it may be implied, that the first taker may apply any part of the subject to his own use, are held to prevent the subject of the gift from being considered certain. And a

vague description of the object, that is, a description by which the giver neither clearly defines the object himself, nor names a distinct class out of which the first taker is to select, or which leaves it doubtful what interest the object or class of objects is to take, will prevent the objects from being certain within the meaning of the rule." In 1 Jarman on Wills, (5th Am. ed.,) p. 680, it is said that "if the gift be expressly in trust, though to be disposed of in such manner and for such purposes as the devisees think fit, they are trustees, and the beneficial interest results to the heir or next of kin, and a gift ' to be expended and appropriated in such manner as the donees or a majority of them shall in their discretion agree upon,' would probably without the words 'in trust' produce the same result, for technical language of course is not necessary to create a trust. It is enough that the intention is apparent." Citing *Fowler* v. *Garlike*, 1 Russell & Mylne, 232; *Buckle* v. *Bristow*, 10 Jur. (N. S.), 1095; *Gibbs* v. *Rumsey*, 2 Ves. & B., 292. See also *Wheeler* v. *Smith et al.*, 9 How., 79. In *Morice* v. *Bishop of Durham*, 10 Ves. Jr., 526, Lord ELDON says:—"If a testator expressly says he gives upon trust, and says no more, it has been long established that the next of kin will take. Then, if he proceeds to express the trust, but does not sufficiently express it, or expresses a trust that cannot be executed, it is exactly the same as if he had said that he gave upon trust, and stopped there."

We therefore advise the Superior Court that the oral declarations are inadmissible for the purpose claimed; that " The Freedman's Aid Society of the Methodist Episcopal Church located at Cincinnati, Ohio," cannot take the legacy given to the Freedmen's Association; that the bequests to the freedmen as a class are void for uncertainty; and that Fairfield takes nothing under the will.

In this opinion the other judges concurred.